614 So.2d 189 (1993)
Angelique CORNETT, et al., Plaintiffs-Appellees-Appellants,
v.
STATE of Louisiana Through W.O. MOSS REGIONAL HOSPITAL, et al., Defendants-Appellants-Appellees.
No. 92-148.
Court of Appeal of Louisiana, Third Circuit.
February 3, 1993.
Writ Denied May 7, 1993.
*191 Schrumpf & Schrumpf, Oliver J. Schrumpf, Sulphur, for plaintiffs-appellees-appellants.
Stockwell, Sievert, Viccellio, Clements & Shaddock, Robert W. Clements, James Blanco, Lake Charles, Blue, Williams & Buckley, C.T. Williams, J. Elliott Baker, Metairie, for defendants-appellants-appellees.
Before DOMENGEAUX, C.J., and DOUCET and DECUIR, JJ.
DECUIR, Judge.

PROCEDURAL HISTORY
This case involves a medical malpractice suit filed by Angelique Cornett, individually and as natural tutrix of the minors, William Shannon Cornett, and Jenevieve Suzanne Cornett adverse to the State of Louisiana through W.O. Moss Regional Hospital for the wrongful death of William Brooks Cornett. Plaintiffs bring this wrongful death and survival action pursuant to LSA-R.S. 40:1299.39 et seq. and allege the unconstitutionality of any purported limitation on recovery of damages. Prior to trial, William Shannon Cornett reached the age of majority and an order was rendered substituting William Shannon Cornett as a party plaintiff.
After a trial, reasons for judgment were issued and judgment rendered in favor of *192 plaintiffs, Angelique Cornett and William Shannon Cornett and on behalf of the minor, Jenevieve Suzanne Cornett, and against the defendant, State of Louisiana through W.O. Moss Regional Hospital in the sum of $500,00.00 plus costs of court including expert witness fees. The trial judge further ordered interest in accord with LSA-R.S. 40:1299.39.1(K) and LSA-R.S. 13:5112(C), at the rate of six (6%) percent per annum from date of filing (January 11, 1988) until date of judgment and thereafter the rate provided by La.C.C.P. Art. 2924.
The trial court in his reasons for judgment evaluated damages as follows:

ECONOMIC DAMAGES:
Loss of earnings to plaintiff's $300,000.00
Funeral and Burial Expenses 4,177.90
Survival Action 100,000.00
WRONGFUL DEATH CLAIMS:
Angelique Cornettfor loss of
love, affection and consortium 250,000.00
William Shannon Cornett- 100,000.00
Jenevieve Suzanne Cornett- 100,000.00
TOTAL SUMS OF AWARDS: $854,177.90

Although the sum of the awards exceeds the $500,000.00 limitation of recovery, the trial judge recognized the applicability of LSA-RS 40:1299.39 stating that the judgment would be enforceable only as to $500,000.00, and declined to declare LSA-R.S. 40:1299.39 et seq. unconstitutional.
Thereafter, plaintiffs filed a Motion for Limited New Trial asserting for the first time the inapplicability of LSA-R.S. 40:1299.39 et seq. Plaintiff further reasserted the unconstitutionality of any statutory limitation on recovery and additionally insufficiency of damages awarded. A judgment denying plaintiff's motion for new trial was rendered and signed on October 13, 1991.
The State of Louisiana through W.O. Moss Regional Hospital filed a suspensive appeal asserting that the trial court erred: (1) in finding that the defendant breached the relevant standard of care and in finding that the treating physicians at W.O. Moss Regional Hospital failed to use reasonable care and diligence and best judgment in the application of their skills; (2) in awarding $300,000.00 as loss of earnings; and (3) in awarding $100,000.00 for the survival action of William Cornett.
Plaintiffs answered the appeal urging that the trial court erred in applying LSA-R.S. 40:1299.39 et seq. retroactively since the factual set of circumstances in this case occurred in 1986 and 1987, prior to the 1988 amendment of LSA-R.S. 40:1299.39 et seq. Plaintiffs argue in the alternative that if any statutory limitation on recovery does apply, then only LSA-R.S. 13:1506 applies to the facts of this case. Alternatively, plaintiffs allege that any statute attempting to limit damages is unconstitutional. Finally, plaintiffs assert that the awards for the survival action of William Brooks Cornett and for general damages to the children of the decedent are inadequate and should be increased. Plaintiffs further allege a frivolous appeal by defendant and seek remedy pursuant to La.C.C.P. art. 863.
Plaintiffs have filed two motions on appeal to supplement the record to include in the record on appeal service information on the Attorney General and another to include plaintiffs' memorandum in support of the motion for new trial.
We deny plaintiffs' motions to supplement the record and affirm the trial court's judgment.

FACTS
The decedent apparently began suffering from symptoms of acromegaly in 1982. Acromegaly is a disease generally caused by a pituitary tumor resulting in over secretion of human growth hormone. The tumor is non-malignant in 95 out of 100 cases. This disease manifests itself by unusual enlargement of facial features, hands, feet and soft tissues of the body. By 1983 the symptoms so distorted the decedent's appearance that he was terminated from his employment as a Quality Assurance Contract Consultant. Subsequent to losing his position as a consultant, the decedent was self-employed as a "handyman."
*193 The decedent was seen by Dr. Arthur Primeaux in Lake Charles, Louisiana, in November and December of 1983 for complaints of low grade fever, cough and congestion. According to Dr. Primeaux, the decedent had definite signs of acromegaly in December of 1983. Dr. Primeaux referred Mr. Cornett to Moss Regional because decedent continued to display hypertension, which Dr. Primeaux surmised may have been due to the acromegaly. Dr. Primeaux discussed his impression of acromegaly with the decedent and made a telephone call to Moss Regional Hospital for the referral and to schedule an appointment for decedent to be seen for acromegaly. The medical records, however, do not reflect an appointment scheduled at Moss Regional.
The decedent was seen at Moss Regional on February 15, 1985, at which time he complained of an earache and again on October 14, 1985, for a laceration to the left forearm. Acromegaly is noted in the hospital chart on both February 15 and October 14, 1985.
The decedent was seen by Dr. Francine A. Manuel, then a family practice resident at Moss Regional, on February 28, 1986, for complaints of sore throat. Dr. Manuel noted the decedent's blood pressure to be elevated and felt the blood pressure condition warranted treatment. Dr. Manuel referred Mr. Cornett to the hospital Day Clinic for follow-up.
Dr. Manuel's next visit with the decedent was on March 8, 1986, at which time the decedent complained of pain in the chest, back, upper arms, and also complained of sleep apnea for the past five (5) years. Sleep apnea is a condition in which mechanical obstruction to breathing occurs and breathing stops. According to the medical testimony adduced at trial, acromegaly is one possible cause of sleep apnea. Dr. Manuel referred the decedent to the Endocrinology Clinic at Moss Regional "A.S.A.P." for acromegaly. It is undisputed that an appointment was not scheduled by hospital personnel as ordered by Dr. Manuel.
The decedent was seen again in the emergency room at Moss Regional on October 31, 1986, by Dr. Thomas Fontenot at which time Mr. Cornett complained of suffering from sleep apnea for four to five years. Dr. Fontenot noted a history of acromegaly. Decedent related that he was worried that he may be in a "diabetic coma." Dr. Fontenot ordered testing, which ruled out diabetes. Because the decedent fell asleep in the examination room, Dr. Fontenot ordered arterial blood gases be performed. The results of the blood gases were p.H. 7.34 compared to a normal of 7.35 to 7.45; an elevated carbon dioxide; a low oxygen level; and a mildly elevated HCO3 or bicarbonate of 29.3. Dr. Fontenot's diagnosis was acromegaly by history and sleep apnea. The decedent was sent home and a General Medicine Clinic appointment was scheduled for November 3, 1986. Dr. Fontenot testified Mr. Cornett related to him on this visit a concern regarding his sleep apnea condition because he had fallen asleep while driving and Dr. Fontenot acknowledged at trial that Mr. Cornett requested treatment for his sleep apnea.
A review of the record reveals the procedure at Moss Regional is that a patient must first be seen at the General Medicine Clinic prior to being seen at one of the hospital's speciality clinics. According to Dr. Fontenot, the General Medicine Clinic appointment scheduled for November 3, 1986 was accomplished in order to give the decedent access to the Endocrinology Clinic. The purpose of referral to the Endocrinology Clinic was to obtain an objective diagnosis of acromegaly.
On November 3, 1986, decedent was again seen by Dr. Fontenot. Testing was ordered to confirm acromegaly. The decedent was referred to the Endocrinology Clinic and to the Ophthalmology Clinic at Moss Regional and was placed on a 1200 calorie diet. The results of the testing ordered by Dr. Fontenot revealed an elevated human growth hormone of twenty-five (25), the normal range for a male being 0 to 5. This along with the physical examination confirmed the diagnosis of the acromegaly, according to Dr. Fontenot.
*194 Decedent was seen at the Endocrinology Clinic on November 18, 1986, at which time he was examined by Dr. William Haynes, chief resident at W.O. Moss Regional Hospital. Dr. Haynes confirmed a diagnosis of acromegaly and central hypoxia as a result of his examination and test results of the arterial blood gases obtained on October 31, 1986. According to medical testimony, central hypoxia is defined as a decrease in oxygen in the blood at a given time. Dr. Haynes recommended that decedent be followed in the endocrinology system of Moss Regional and scheduled a Endocrinology Clinic appointment for two months. No other treatment was rendered on November 3, 1989 for the sleep apnea. Dr. Haynes also scheduled a Chest Clinic appointment to rule out pulmonary disease, and ordered chest x-rays, pulmonary function and a repeat of arterial blood gases. Mr. Cornett died before his scheduled appointment at the Endocrinology Clinic on January 11, 1987. Cause of death was documented as cardio-pulmonary arrest as a consequence of pituitary tumor.
Plaintiffs in their suit name as defendant the State of Louisiana through Walter Olin Moss Regional Hospital and specifically allege that said defendant is liable through the acts, omissions, and fault of the individuals, agencies, agents, doctors and employees of the said defendant hospital as set forth in Exhibit A, attached to the Petition, pursuant to LSA-R.S. 40:1299.39, et seq. The pertinent portion of Exhibit A attached to plaintiffs suit states the following: "Specific acts and omissions of doctors or employees of W.O. Moss Regional Hospital supplement paragraph one of the petition." Plaintiffs then enumerate in Exhibit A the following:
Dr. Gwen Teekel, Dr. H. Gibson, Dr. Gerald Mouton, Dr. Dwight Thomas Curtis, Dr. William Mark Haynes, unknown doctors or other medical personnel or hospital employees who either failed to set up appointments or failed to maintain records of appointments of William Brocks Cornett at Moss Regional Hospital from on or about December 1, 1983 until February 15, 1985; unknown person or persons who completed, changed or altered the lab reports shown as March 7, 1986 for William Brooks Cornett in the medical records of Moss Regional Hospital, if such records were incorrectly completed or altered; and unknown person or persons who provided examinations, treatment, or diagnosis, recommendations, or should have provided examinations, treatment, diagnosis or recommendations of surgery or chemotherapy or radiation therapy to William Brooks Cornett from January 1, 1983 through January 11, 1987; and who failed to properly maintain records of said medical care, treatment or recommendations.
Plaintiffs allege that defendant breached the standard of care required of every health care provider in rendering professional services to a patient and enumerated the acts of negligence with particularity in their petition. Plaintiffs asserted in their petition that each party defendant herein is a "person" entitled to "coverage" within the meaning of LSA-R.S. 40:1299.39 and further asserted that the defendants were each acting within the course and scope of their employment or contract for health care services.

STANDARD OF CARE
W.O. Moss Regional Hospital argues that the evidence at trial failed to establish that the actions of the defendant constituted a breach of the "local standard of care" under the circumstances. The defendant hospital contends that the trial court abused its discretion by improperly relying on the testimony of a "single" expert witness concerning the deviation by the defendant from the local standard of care, where that testimony was based on a review of factual circumstances in hindsight and in light of subsequent events. For the following reasons, this court finds no abuse of discretion in the trial court's application of the law and finding of liability.
Determining whether the hospital has breached the standard of care it owes to a particular patient depends upon the circumstances and facts of that case. *195 Hunt v. Bogalusa Community Medical Center, 303 So.2d 745 (La.1974); Galloway v. Baton Rouge General Hospital, 602 So.2d 1003 (La.1992). The duty of care owed by a hospital is not governed by the locality rule. Keyworth v. Southern Baptist Hospital, 491 So.2d 15 (La.1986). Recently, in Griffin v. Kenberger, 595 So.2d 645 (La.1992), the Supreme Court summarily granted certiorari and held that plaintiffs were entitled to present testimony as to the national standard of care for administration of oxygen to premature infants in 1964.
At trial, the court accepted Dr. Martin Lewis Bell as an expert qualified to testify as to the standard of care applicable to the defendant hospital. Dr. Bell completed an internship in general surgery and thereafter performed a fellowship in plastic and reconstructive surgery. The record reflects that Dr. Bell is a member of the staff of several hospitals in Baton Rouge and Tulane University Center. Furthermore, Dr. Bell has previously held staff positions at Earl K. Long Hospital in Baton Rouge and Charity Hospital in New Orleans, Louisiana. Therefore, Dr. Bell has worked in the State Charity Hospital System and is familiar with the standard as to hospital charting, clinic appointments, testing, and appointments scheduled by non-medical employees. The court also notes the testimony of Dr. Francine Manuel and Dr. Primeaux regarding hospital charting, scheduling of clinic appointments and testing, and cannot agree with defendant that the trial court relied on the testimony of a "single" expert in finding a deviation from the standard of care by defendant. Furthermore, the testimony of Tanya Johnson, hospital appointment clerk, supports the trial court's finding of the duty of hospital employees to carry out physician orders.
The trial court's judgment is to be upheld in the absence of manifest error. Where there is a conflict of testimony, reasonable evaluations of credibility and inferences of fact should not be disturbed upon review. Rosell v. ESCO d/b/a Jolly Elevator Corporation, 549 So.2d 840 (La. 1989). We agree with the trial court's findings. A review of the record reveals that reasonable persons could have concluded that there was a breach of the duty owed on the part of Moss Regional under the facts of this case.
Dr. Bell testified that the disease which caused the plaintiff's death was treatable and had the decedent received appropriate medical treatment for his condition, he would have survived. It was Dr. Bell's opinion that the cause of decedent's death was respiratory obstruction or sleep apnea. The record reflects the consensus of the medical testimony that the cause of death was more likely due to "sleep apnea." Dr. Bell testified that people who suffer from sleep apnea are at high risk for automobile accidents or other accidents. According to Dr. Bell, there were several forms of treatment available for the decedent's condition including surgery, radiation, continuous positive airway pressure, diet, tracheostomy, and medication.
The record reflects that although Dr. Manuel ordered an Endocrinology Clinic appointment "ASAP" and an ear, nose and throat appointment, the medical records reflect, and Dr. Haynes admitted at trial, that no place in the medical records could he find that Dr. Manuel's order for an Endocrinology Clinic appointment was followed. Furthermore, there is no evidence that Mr. Cornett ever received notice of an ENT appointment, as ordered by Dr. Manuel.
The record reflects that the physicians at Moss Regional were aware of Mr. Cornett's medical condition, specifically the acromegaly and sleep apnea. Dr. Fontenot acknowledged that sleep apnea is a potentially fatal condition and that he felt that the patient had a problem that needed to be addressed. Dr. Fontenot did not advise the decedent of the risks of death from the sleep apnea. Dr. Haynes also acknowledged that sleep apnea can result in death and that this condition is a sequela of acromegaly. Dr. Mouton also testified that sleep apnea can result in death and stated that the decedent had a disabling condition.
Dr. Haynes further testified that he was aware at the time that he saw the decedent of different treatment alternatives for *196 acromegaly including surgery, medication, radiation, tracheostomy. It is defendant's position that the decedent refused treatment for the acromegaly. However after impeachment at trial, Dr. Haynes admitted that he never recommended surgery to the decedent. In fact, in a deposition taken two (2) years prior to trial, Dr. Haynes stated he made no personal recommendation to Mr. Cornett for surgery or any other type of treatment.
Dr. Bell testified that there was a breach of care on the part of the defendant, in that it was negligent in failing to respond to decedent's worsening medical situation. Dr. Bell testified along with plaintiff's expert, Dr. David Braunstein, an endocrinologist, that emergency treatment was appropriate based on the decedent's medical condition.
We agree with the trial court that there is no evidence in the medical records that plaintiff was advised of the serious risks of sleep apnea. All of the physicians who testified in fact admitted that each of them did not advise the plaintiff of this risk.
Furthermore, the defendant's own expert, Dr. Kevin Mocklin, an internist practicing in Lake Charles, Louisiana, acknowledged the decedent's disabling condition. Dr. Mocklin further acknowledged that sleep apnea may lead to life threatening cardio-respiratory events. In fact, Dr. Mocklin acknowledged that apnea is a recognized emergency.
The record supports the trial court's finding that treatment of either the acromegaly or sleep apnea condition would have resulted, more likely than not, in the continuing survival of William Brooks Cornett.

QUANTUM
In order to disturb an award of damages made by the trial court, the record must clearly reveal that the trial court abused his discretion in making the award. Molbert v. Toepfer, 540 So.2d 577 (La.App. 3rd Cir.1989); Thompson v. Colony Insurance Company, 520 So.2d 1158 (La.App. 3rd Cir.1987). W.O. Moss Regional argues that the trial court abused its discretion in awarding $300,000.00 as loss of future earnings. The only expert to testify concerning loss of earnings was Dr. Pettingill, Jr., economist, who testified on behalf of plaintiffs. Dr. Pettingill acknowledged that there was no documentation of earnings from 1982 through 1985. However, plaintiffs contend decedent did receive earnings during this period. Income tax records indicate earnings in 1986 in the amount of $7,150.00. Dr. Pettingill reported a loss of earnings in the amount of $348,879.00 for loss of support and services had Mr. Cornett lived a normal life expectancy. Based upon the assumption that decedent earned $7,150.00 for each of the years from 1982-1985, Dr. Pettingill projected a total loss of earnings and services in the amount of $182,180.00.
Although, Dr. Pettingill initially projected a loss of earnings in the amount of $348,879.00, the trial judge reduced the award to $300,000.00. Calculations of loss of future earnings are at best speculative and cannot be made with absolute certainty. King v. Louviere, 524 So.2d 65 (La. App. 3rd Cir.1988); Freeman v. Harold Dickey Transport, Inc., 467 So.2d 194 (La. App. 3rd Cir.1985); Robinson v. Graves, 343 So.2d 147 (La.1977). Furthermore, damages for loss of future earnings or future earning capacity is based upon the injured person's ability to earn money, rather than on what he actually earned prior to the injury. Freeman, supra; Merrell v. State through the Department of Transportation, 415 So.2d 660 (La.App. 3rd Cir.1982), writ denied 420 So.2d 443; Folse v. Fakouri, 371 So.2d 1120 (La.1979). Actual earning capacity at the time of injury, although relevant is not necessarily determinative of the injured person's future ability to earn. Freeman, supra; Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976).
Because of the speculative nature of an award for future loss of income, there is no right formula at arriving at an award. Rather, the trial court must exercise sound discretion and award an amount that is fair to both litigants while not being unduly oppressive to either. Freeman, supra; Viator *197 v. Gilbert, 253 La. 81, 216 So.2d 821 (1968).
The decedent was only 39 years old at the time of his death. Dr. David Braunstein testified that plaintiff could have returned to work within one to two months after surgery depending upon whether the sleep apnea improved from the surgery and if appropriate therapy was received for the sleep apnea, in which case, Dr. Braunstein opined that Mr. Cornett could have returned to gainful employment quite rapidly. This testimony is uncontradicted.
For the foregoing reasons, we do not find that the trial court abused its discretion in the award for loss of earnings.
We next address the amount awarded by the trial court for the survival action of the decedent. Defendant argues that the trial court award of $100,000.00 for the survival action of William Cornett is excessive. Conversely, plaintiffs argue that the damage award for the survival action for the decedent is inadequate.
Before an appellate court can disturb a quantum award, the record must clearly reveal that the trier of fact abused its discretion in making the award. An award made in the trial court may not be modified unless it is unsupported by the record. The question is not whether a different award may have been more appropriate, but whether the trial court's award can be reasonably supported by the record. Coco v. Winston Industries, Inc. 341 So.2d 332 (La.1976); Bitoun v. Landry, 302 So.2d 278 (La.1974). The trial court found that the decedent's last months were excruciatingly painful. This finding by the trial court is supported by the testimony at trial. It was the testimony of Angelique Cornett that her husband never refused treatment and in fact begged for treatment from the physicians at W.O. Moss Regional. Mrs. Cornett testified that shortly prior to his death, decedent would stop breathing 20 to 30 times a night and that decedent experienced extreme pain in his shoulders, jaw and hip. Mrs. Cornett stated that the decedent would have to use his own strength to pull his shoulder and jaw in place which would become dislocated due to his illness.
A review of jurisprudence in similar cases reveals that the award for the survival action by the trial court in this case is not an abuse of discretion.
Finally, plaintiffs argue that the damages awarded to the decedent's two children is inadequate. We note the evidence at trial indicates that decedent had a very close and loving relationship with his children and that he spent a lot of time with his children. Based upon a review of the jurisprudence, we find that the damages awarded to the decedent's children is not an abuse of discretion. Ingram v. Caterpillar Machinery Corporation, 535 So.2d 723 (La.1988).

APPLICABILITY OF LSA-R.S. 40:1299.39, et seq.
A review of plaintiffs' petition reveals that suit was brought against W.O. Moss Regional for its vicarious liability for the delicts of its employees and those within its control, pursuant to LSA-R.S. 40:1299.39 et seq. There was no evidence submitted at trial as to the hospital's primary or independent liability. In fact, plaintiff counsel's pretrial and trial conduct from the inception of the suit through the trial indicated that the action was based on the vicarious liability of the hospital. The inapplicability of LSA-R.S. 40:1299.39, et seq. was raised for the first time after judgment was rendered. Plaintiffs' motion to supplement the record in this respect is denied. Although LSA-C.C.P. art. 862 provides that except in a case of a default judgment, every final judgment must grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in its pleadings, here the plaintiffs' failure to allege the primary and independent negligence of the hospital and the plaintiffs' pretrial and trial conduct improperly and substantially prejudiced defendant's presentation of its defense and unfairly deprived the defendant of an opportunity to prepare and assert potential protective and mitigative defenses. We conclude the plaintiffs are not entitled to relief pursuant to LSA-C.C.P. *198 art. 862. T.L. James and Company v. Kenner Landing, Inc., 562 So.2d 914 (La. 1990).

CONSTITUTIONALITY
For the following reasons, plaintiff's argument as to the constitutionality of LSA-R.S. 40:1299.39, et seq. 40:1299.39.1(K), 13:5106 and 13:5112(C) will not be considered. The record reflects that the Attorney General was not made a party to this action. Where the constitutionality of a statute is at issue, the Attorney General not only must be served, but is an indispensable party. La.C.C.P. art. 1880; Lemire v. New Orleans Public Service, Inc., 458 So.2d 1308 (La.1984); Travers-Wakeford v. St. Pierre, 585 So.2d 580 (La.App. 4th Cir.1991), writ denied, 592 So.2d 409 (La.1992); Faustina Pipeline v. Romero, 499 So.2d 1009 (La.App. 3rd Cir.1986). Accordingly, this court will not consider plaintiffs' arguments as to the constitutionality of these statutes. Even if the issue of constitutionality were properly before the court, the record reveals the trial court was correct in finding the statutes constitutional, as plaintiffs failed to meet their burden of proof.

FRIVOLOUS APPEAL
Appeals are favored in our law. This court is reluctant to grant damages for a frivolous appeal unless it manifestly appears that the appeal was taken solely for the purpose of delay or that appealing counsel does not seriously believe in the position he is advancing. Bellard v. Safeway Insurance Company, 442 So.2d 1314 (La.App. 3rd Cir.1983); Doyle v. Picadilly Cafeterias, 576 So.2d 1143 (La.App. 3rd Cir.1991). We cannot say that the penalties for frivolous appeal are clearly due in this case.
We affirm.